CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 3 1 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | | |
|---|---|---|
| **SCHWARZ & SCHWARZ OF VIRGINIA, L.L.C.,** and **SCHWARZ & SCHWARZ, L.L.C.,** | ) ) ) ) ) | |
| | ) | **Civil Action No. 6:07cv042** |
| **Plaintiffs,** | ) | |
| v. | ) ) | |
| **CERTAIN UNDERWRITERS AT LLOYD'S, LONDON WHO SUBSCRIBED TO POLICY NUMBER NC959** | ) ) ) ) | **By: Michael F. Urbanski** **United States Magistrate Judge** |
| **Defendant.** | ) ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court for Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) as to several outstanding motions:

I.      Motions filed by Defendant Certain Underwriters at Lloyd's, London Who

Subscribed to Policy Number NC959 ("Underwriters"), as follows:

Docket # 62.  Motion for Leave to Amend Counterclaim.

Docket # 60.  Motion for Judgment on the Pleadings.

Docket # 70.  Motion for Summary Judgment.

II.      Motion filed by Schwarz & Schwarz of Virginia, LLLC, and Schwarz & Schwarz,

LLC ("Schwarz"), as follows:

Docket # 68.  Motion for Partial Summary Judgment as to Damages.

For the following reasons, it is **RECOMMENDED** that the Motion for Leave to Amend

Counterclaim (Docket # 62) be **DENIED**.  It is also **RECOMMENDED** that the Motion for

Summary Judgment (Docket # 70) be **GRANTED**, and the Motion for Judgment on the

Pleadings (Docket # 60) and Motion for Partial Summary Judgment (Docket # 68), be **DENIED**

as moot.

## STATEMENT OF FACTS

This is a dispute over insurance coverage for a fire which occurred on November 11,

2005, at a former Lane Furniture warehouse located in Altavista, Virginia owned by Schwarz and

insured by Underwriters. The warehouse, referred to as Plant 2, had a sprinkler system for fire

protection, and the fire insurance policy contained a Protective Safeguards Endorsement which

provided a coverage exclusion as follows:

> We will not pay for loss or damage caused by or resulting from fire
> if, prior to the fire, you:
>
> (a)   Knew of any suspension or impairment in any protective
>       safeguard listed in the Schedule above and failed to notify us
>       of that fact; or
>
> (b)   Failed to maintain any protective safeguard listed in Schedule
>       above, and over which you had control, in complete working
>       order.
>
> If part of an Automatic Sprinkler System is shut off due to
> breakage, leakage, freezing conditions or opening of sprinkler
> heads, notification to us will not be necessary if you can restore full
> protection within 48 hours.

(Exhibit B to Complaint, Docket # 1, at 27.)

It is undisputed that the sprinkler system at Plant 2 developed a leak, and that Sean

Pillow, the Schwarz employee responsible for that system, was trying to isolate and repair the

leak in the weeks preceding the November 11, 2005 fire. It is also undisputed that by the time of

the fire, Pillow had isolated the leak to a portion of the southern loop of the sprinkler system, but

had not yet made the repairs. It is undisputed that in order to make the repairs, in the weeks prior

2

to the fire, Pillow attempted to shut off the flow of water to the southern loop of the Plant 2 sprinkler system by closing two control valves, partially closing a third curb box valve and opening a hydrant. It is further undisputed that Schwarz did not notify Underwriters of the leak in the sprinkler system or that part of the system was shut down to effectuate the repairs at any time prior to the fire.

Underwriters contend that the exclusion in the Protective Safeguards Endorsement applies and that no insurance coverage is owed for the fire loss because (1) Schwarz failed to maintain the sprinkler system in complete working order; and (2) Schwarz did not notify Underwriters that part of the system had been shut off for several weeks in an effort to isolate and repair the leak.

Schwarz responds that it did, in fact, maintain the sprinkler system, as evidenced by its efforts to find and repair the leak. In this regard, Schwarz's expert witness opines that the leak in the system was so small that it would not compromise its ability to suppress a fire. Further, Schwarz contends that no notification to Underwriters was required as the sprinkler system could have been restored to full protection within 48 hours, and was, in fact, restored to full protection for a portion of each day and a few hours after the fire started. Schwarz explains that in an effort to isolate the leak and repair the sprinkler pipe, Sean Pillow closed three valves and opened a hydrant in the system's southern loop in the weeks leading up to the fire. Unfortunately, one of the valves, referred to as a curb box valve, would not fully shut despite Pillow's daily efforts to get it to do so. Pillow testified that he manually exercised, meaning opened and closed, this valve each day to try to get it to fully seal. Schwarz maintains that when the curb box valve was opened each day, full protection, in the language of the 48 hour exclusion exception, was restored to the southern loop of the sprinkler system as water flowed through it when the valve was open.

3

Thus, per Schwarz's reasoning, there was no 48 hour period that the system lacked full protection. On that line of reasoning, Schwarz argues that the Protective Safeguards Endorsement did not require that Underwriters be notified of the sprinkler system leak and repairs as the system was filled with water at least once every 48 hours.[1]

For their part, Underwriters contend that Schwarz's interpretation of the notification requirement under the policy is absurd as the policy cannot reasonably be read to allow Schwarz to avoid notifying Underwriters that part of the sprinkler system was shut down due to a leak merely because Schwarz exercised the curb box valve at least once a day, which had the effect of temporarily filling the southern loop with water. Underwriters maintain that this is particularly true as at all times during the weeks leading up to the fire, Pillow left open a hydrant on that loop from which the water could drain. Thus, even though some water continued to flow through the curb box valve after Pillow tried to exercise it, Underwriters assert that this water could flow out of the system through the open hydrant. There is no dispute that at all times during the weeks leading up to the fire, the fire protective system was shut down to this extent: (1) two control valves on the southern loop were closed; (2) the curb box valve was partially closed, except when Pillow manually exercised it; and (3) one hydrant was partially open. Underwriters contend, therefore, that under the terms of the policy, because part of the sprinkler system was shut off for several weeks leading up to the fire and not restored to full protection within 48 hours, Schwartz was required to notify them, which Schwarz did not do.

----

[1] Underwriters argue that as Pillow only worked Monday through Friday, the system was shut down for more than 48 hours each weekend. Schwarz has no response, except to reiterate its position that the valve could have been opened within 48 hours.

4

## 1.      Underwriters' Motion to Amend Counterclaim

On July 8, 2009, after the close of discovery and well over three years after Underwriters began their investigation into the fire, Underwriters moved for leave to amend its Counterclaim to add certain additional legal theories. "[L]eave to amend should 'be freely given when justice so requires,' Fed.R.Civ.P. 15(a), the district court may deny leave to amend for reasons 'such as undue delay, bad faith or dilatory motive on the part of the movant . . . .'" and prejudice to the opposing party. Glaser v. Enzo Bicohem, Inc., 464 F.3d 474, 480 (4th Cir. 1996) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). The gravamen of the Proposed Amended Counterclaim is to declare the insurance policy void or rescinded due to misrepresentations in the application and the claim filed in this case and that the insurance claim for fire loss and this lawsuit are fraudulent and in violation of the North Carolina Unfair Trade Practices statute.

The specific alleged misrepresentations are set forth in paragraphs 25 through 32 of the Proposed Amended Counterclaim. They consist of the following:

> 25.    It [sic] its Application for the Policy, Schwarz represented that the Property was 500,000 square feet.
>
> 26.    In its Application for the Policy, Schwarz represented that the Property was two stories.
>
> 27.    In its Application for the Policy, Schwarz represented that the Property was Masonry-Noncombustible.
>
> 28.    In its Application for the Policy, Schwarz represented that the Property had a fully functional sprinkler system.
>
> 29.    Schwarz has denied that the sprinkler system was turned off and drained to avoid freezing prior to and at the time of the November 11, 2005, fire; however, this is not true.
>
> 30.    Schwarz has denied that the sprinkler system was impaired prior to and at the time of the November 11, 2005, fire; however, this is not true.

5

31.     Schwarz has denied that the sprinkler system was suspended prior to and at the time of the November 11, 2005 fire; however, this is also not true.

32.     Schwarz expressly represented that it maintained the sprinkler system in complete working order prior to and at the time of the November 11, 2005, fire; however, this is untrue.

(Exhibit 16 to Motion to Amend, Docket # 62, at 8-9.)

Issues concerning the insurance application have been at the core of this dispute since the inception of this case. Indeed, the application was an exhibit to the Complaint. Underwriters investigated the fire loss for nearly two years before the Complaint was filed, and had ample opportunity to observe the structure of the building, how many floors it had in it and its square footage. To the extent that the Proposed Amended Counterclaim alleges those specific representations for the first time, it comes far too late in this case. Indeed, the Initial Loss Advice provided by Crawford & Company, the claims adjuster, dated December 9, 2005, noted the discrepancy with the number of floors listed in the insurance policy and stated that "[t]his is a mammoth furniture manufacturing plant, which is drastically underinsured and the application should check for proper representation and [sic] time of writing." (See Exhibit E to Schwarz's Memorandum in Opposition to Motion for Leave to Amend, Docket # 74, at 000257.) Thus, for more than two years before their original Counterclaim was filed, Underwriters had concerns over representations in the insurance application. Additionally, any claimed misrepresentation that the sprinkler system was or was not "fully sprinklered" is, and always has been, at the center of this case. As such, it is far too late for Underwriters to seek new affirmative relief based on facts that have been within their purview for several years.

To the extent that the Proposed Amended Counterclaim seeks declaratory relief, there is no harm to Underwriters in denying this motion as the issues noted above are already at issue in

this case. Indeed, the Sixteenth Affirmative Defense asserts that the suit is barred "to the extent that the Plaintiff may have made misrepresentations with regard to the application and/or claim for insurance . . . ." (Underwriters' Answer, Docket # 7, at 9.) Thus, Underwriters have preserved as a defense in this case their assertions that Schwarz has made misrepresentations in its insurance application or fire loss claim. To that extent, not only are Counts I through III of the Proposed Amended Counterclaim untimely, they are unnecessary, because the defense of misrepresentation in the insurance application and claim are already a part of the joined issues in this case.

The next question is whether Counts IV through VI, alleging common law fraud and a violation of the North Carolina Unfair and Deceptive Trade Practices Act, should be allowed. At oral argument, counsel for Underwriters argued that the thrust of these claims is that Schwarz engaged in fraud and unfair business practices by taking the position, both in filing its claim and prosecuting this lawsuit, that the Plant 2 sprinkler system was in working order. Underwriters assert that a certain email dated October 18, 2005 authored by Sean Pillow and produced in discovery demonstrates that Schwarz's position is fraudulent, as that email states that "[t]he rest of the system of underground loops that are normally off was checked for flow at the drain of each riser and at a hydrant for each loop (North, East, South). These loops are dry and have no water in any of them . . . ." (Exhibit 10 to Underwriters' Motion for Leave to Amend, Docket # 62.) Further, in support of its motion to amend, Underwriters assert that documents from various responding fire departments indicate that Pillow told them on the night of the fire that all or part of the sprinkler system had been shut off and drained. Underwriters also rely heavily on the deposition testimony of Altavista Fire Chief John Tucker, taken on June 16, 2009. Underwriters assert that:

> Chief Tucker testified that Sean Pillow told him that the sprinkler system was drained because Schwarz had experienced problems with freezing and Schwarz considered it too costly to repair the resulting damage. This information directly contradicts Schwarz's representations made in the submission of its insurance application, the claim for this fire loss, and throughout this litigation.

(Underwriters' Memorandum in Support of Motion for Leave to Amend, Docket # 63, at 7.)

The problem for Underwriters with asserting new claims based on these facts after the close of discovery in this case is that these facts had been known by or available to Underwriters for several years. All of the Exhibits to the Proposed Amended Counterclaim predate the filing of the Complaint in this case. Moreover, both of the October, 2005 Sean Pillow emails relied upon heavily by Underwriters to support their fraud claim were attached to the original Counterclaim. (Exhibit D to Underwriters' Answer and Counterclaim, Docket # 7, at 40-41. Cf. Exhibits 10 and 12 to the Underwriters' Motion for Leave to Amend, Docket # 62.) Indeed, well prior to suit being filed, Underwriters took an Examination Under Oath from Pillow for more than four hours on March 14, 2006 on the fire loss claim and the operation of the sprinkler system. (Exhibit 2C to Underwriters' Motion for Leave to Amend, Docket # 62.) Further, the Underwriters' own claims file from the earliest stages of the investigation of this fire loss contains documents stating that both the Fire Marshal and Chief Tucker believe the sprinkler system was shut down at the time of the fire. (See Exhibit C to Schwarz's Memorandum in Opposition to Motion for Leave to Amend, Docket # 74.) Underwriters were also aware of a memorandum from Chief Tucker to Rodney Lawson, the Fire Marshal, dated March 28, 2007, stating that Pillow told him on the morning of the fire that "if he could have done anything differently he would have turned on the sprinkler system in the area where the construction crew

8

was wielding (sic)."  (See Exhibit D to Schwarz's Memorandum in Opposition to Motion for Leave to Amend, Docket # 74.)

Underwriters excuse their tardy filing of the Proposed Amended Counterclaim by asserting that they did not understand the Pillow reference to the North, East and South loops of the sprinkler system, but this assertion hardly rings true as Underwriters examined Pillow under oath as early as March, 2006 and had the opportunity to question him on this subject. Further, Underwriters were on site at Plant 2 investigating the fire and had conversations with the fire officials as early as December, 2005. Underwriters also suggest that they did not depose Chief Tucker until June, 2009, somehow excusing their delay. However, Underwriters certainly were aware of Tucker's view that the sprinkler system was off as reflected in the insurance adjuster's email of December 9, 2005 to that effect. Further, Underwriters likewise were aware that Tucker would testify that Pillow told him that part of the sprinkler system was shut off as reflected in the memorandum to the Fire Marshal dated March 28, 2007. Underwriters took pains to investigate this claim for nearly two years before they denied coverage, and they can hardly say they were surprised by anything they learned in discovery. In short, it is clear that as early as the filing of the original Counterclaim, Underwriters had all of the information they needed to file the proposed amendment. As such, their filing after the close of discovery some eighteen months later is simply too late.

2.     **Underwriters' Motion for Summary Judgment.**

There is no dispute that in the weeks leading up to the fire, the southern loop of the sprinkler in Plant 2 was leaking and that portions of it were shut off to try to isolate and repair the leak. There is no dispute that Schwarz never notified Underwriters of either the leak or the shutdown. There can be no real disagreement, therefore, that Schwarz falls within the terms of

9

the exclusion to the Protective Safeguards Endorsement as it (1) knew the sprinkler was impaired due to the leak and partial shut down, and (2) did not maintain the sprinkler system in complete working order.

This matter turns on the interpretation of the Protective Safeguards Endorsement, an attachment to the insurance policy at issue. Virginia courts treat the interpretation of an insurance agreement like the interpretation of a contract – a question of law properly before the court. Seals v. Erie Insurance Exchange, 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009). The Virginia Supreme Court recently summarized its approach to the interpretation of insurance policies:

> [c]ourts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document. Each phrase and clause of an insurance contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein.

Id. (quoting Floyd v. Northern Next Insurance Co., 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993) (internal quotation marks omitted)). Because insurance contracts are generally written by the insurance company, "courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it." Id. (quoting St. Paul Fire & Marine Insurance Co. v. Nusbaum & Company, Inc., 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984)). Thus, "[w]here two constructions are equally possible, that most favorable to the insured will be adopted" and "[l]anguage in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer." Id. (quoting St. Paul Fire, 227 Va. at 411, 316 S.E.2d at 736). Where a term is not defined in an insurance policy, it is given its "ordinary and

accepted" meaning. Craig v. Dye, 259 Va. 533, 538, 526 S.E.2d 9, 12 (2000); Lower

Chesapeake Assoc. v. Valley Forge Ins. Co., 260 Va. 77, 86, 532 S.E.2d 325, 330 (2000).

Schwarz seeks refuge from its requirement to notify Underwriters of the suspension of the

sprinkler system in the 48 hour exception to the exclusion, arguing that because the Plant 2

sprinkler system could have been restored to full protection within 48 hours, and in fact was

restored to full protection when Pillow exercised the curb box valve each day, no notice to

Underwriters was required. In essence, Schwarz's argument requires the court to read the

"restore full protection" portion of the policy to be an exclusively hydrodynamic term.[2] Schwarz

views the term "restore full protection" only from the standpoint of whether water flowed

through the southern loop of the sprinkler system at some point during each 48 hour period.

Schwarz argues that because it was able to flood the southern loop of the sprinkler system at least

once every 48 hours by exercising the curb box valve, it "can restore full protection within 48

hours," and was not required to provide Underwriters any notice.

But this is a fire insurance policy. Fires do not happen only during normal business hours

when Sean Pillow may be exercising the curb box valve. Full protection, in the context of a fire

insurance policy, must mean more than the sprinkler pipes are capable of being temporarily filled

with water during normal business hours. Rather, the "ordinary and accepted" meaning of

"restore full protection" must have a temporal component, that the sprinkler system is providing

protection at all times. In this light, the 48 hour exception to the fire exclusion makes sense. If

an insured cannot "restore full protection" within 48 hours, it has to notify the insurer. Plainly,

that did not happen here as Schwarz worked for weeks to identify, isolate and repair the leak.

Viewing the term "full protection" as having meaning temporally, rather than just

---

[2] "Restore full protection" is not defined in the policy.

hydrodynamically, there is no disputed issue of material fact. Schwarz had the southern loop of its sprinkler system shut off for several weeks in October and November, 2005, and the southern loop was thus not providing full protection from fire during the periods when Sean Pillow was not exercising the curb box valve. As such, Schwarz was required to notify Underwriters of that suspension. Its undisputed failure to do so requires the court to apply the exclusion to the Protective Safeguards Endorsement.

Each question of fact identified by Schwarz in its briefs and at argument goes to its hydrodynamic theory of "restore full protection." To be sure, there are factual issues as to just how much water was flowing out of the leak, how much water was flowing past the partially closed curb box valve and how much was draining out of the partially open hydrant on the southern loop. But there is no dispute that at the time of the fire this system was partially shut off and was not available to help suppress the fire.

The fire officials consistently attribute the extent of the fire to the failure of the sprinkler system to work. The Campbell County Fire Marshal's Fire Investigation Report states that "[t]he extent of fire damage and the rapid spread of Fire was directly contributed [sic] to the impairment of the Fire Suppression System. According to Mr. Pillow a riser was shut down, also due to observations the night of fire and statements received since, it is apparent that at least some of the remaining system was dry." (See Exhibit D to Answer and Counterclaim, Docket # 7, at 2.)

Schwarz's own fire cause and origin expert, Accident Reconstruction Analysis, Inc., ("ARAI"), stated much the same in a February 3, 2006 report:

> A complete survey of the fire affected areas was conducted jointly with all interested parties. From this survey, it is the conclusion of ARAI personnel that the fire originated on the 2nd floor in the

12

conveyor area near the partition wall between the finishing and table assembly departments. Due to the areas of sprinkler system that were down for maintenance, the fire was able to propagate from this area to surrounding areas via the extensive conveyor system within the plant, as well as through large openings and via drop down.

(See Exhibit 2(4) to Underwriters' Memorandum in Support of Motion for Summary Judgment, Docket # 71, at 22.) In a supplemental Sprinkler System Report for 301 Pittsylvania Avenue, Altavista, Virginia, prepared by the same firm, Schwarz's fire cause and origin expert reiterated that "[d]ue to the status of the sprinkler system, the immediate area of origin was not protected and therefore could burn unrestrained." (See Exhibit I to Schwarz's Memorandum in Opposition Motion for Summary Judgment, Docket # 81, at 7.)[3]

On the night of the fire, Pillow arrived on the scene, opened the curb box valve and closed the hydrant. This action ostensibly helped suppress the fire. Schwarz and its experts contend that Pillow's actions demonstrated that full protection could be and was restored within 48 hours, therefore falling within that exception to the Protective Safeguards Endorsement exclusion. (See Exhibit I to Schwarz Brief in Opposition to Motion for Summary Judgment, Docket # 81, at 10-11; Exhibit J, supra, at 4.) But this contention makes no sense whatsoever. It defies logic to suggest that the sprinkler system is restored to full protection by occasionally opening and closing the curb box valve, and ostensibly allowing water into the southern loop during the period that the valve is open. Schwarz's position that it was not required to notify

--------

[3] An additional Fire Investigation report prepared by Robert Rice at the request of Capital Indemnity Insurance was included by Underwriters as an exhibit to its Motion for Summary Judgment. This report consistently states as follows:

> Once the incipient stage of fire initiated, the spread of the fire should have never reached the area of the adjoining rooms, as the fire sprinkler system should have extinguished the fire at this time. From the examination of the sprinkler system and risers, it is evident that the sprinkler system in this area was not charged and not functional.

(See Docket # 71 to Underwriters' Memorandum in Support of Motion for Summary Judgment, Docket # 71, at 7.)

13

Underwriters of the leak and shut down of the sprinkler system may actually have some merit if the system was left in a charged condition overnight, on weekends and other times when maintenance was not being performed. But just the opposite occurred here. The sprinkler system to the southern loop was shut down for weeks leading up to the fire at all times except when Pillow was exercising the curb box valve. To suggest that brief periods of exercise, when water flowed through the southern sprinkler loop, rendered the system restored to full protection allows the 48 hour exception to swallow the policy exclusion. Under no reasonable reading of the 48 hour exception can it be said that Schwarz was not required to notify Underwriters of the leak and shut down of the sprinkler system merely by opening the curb box valve and allowing the water to flow through the southern loop temporarily. There is no factual dispute that Schwarz was working to find the sprinkler leak for several weeks during October and November, 2005 and that except for the times when Pillow exercised the curb box valve, water to the southern loop of the sprinkler system in Plant 2 was at least partially shut down. Under these circumstances, any reasonable reading of the 48 hour exception to the suspension and impairment exclusion required Schwarz to give Underwriters notice, which it did not do.[4] By suspending the operation of the southern loop of the sprinkler system without providing notice to Underwriters, Schwarz breached its obligation under the policy, rendering the exclusion operative.

There is an additional reason why Schwarz's reliance on the 48 hour exception is flawed. The 48 hour exception only excuses Schwarz's obligation to notify Underwriters of a shutdown to the sprinkler system as required by part (a) of the exclusion. The 48 hour exception does not

---

[4] Schwarz also argues that notice to Underwriters was impossible as they could not be found in London. This argument, too, is absurd as Schwarz easily could have provided notice to the insurance agency to whom it made payment and communicated with as to all other policy issues.

14

grant Schwarz any leeway from its obligation to maintain the sprinkler system as required by part (b) of the exclusion. Part (b) does not concern notification, and the exception to the notification obligation on which Schwarz founds it case cannot reasonably be considered to modify or excuse its obligations to maintain the sprinkler system under part (b). Schwarz contends that it satisfied part (b) by its efforts to isolate and repair the lead. Schwarz argues that its efforts to repair the leak show that it was, consistent with its obligations under the policy, maintaining the sprinkler system. Schwarz's argument misses the point, however. To be sure, it had an obligation to find and repair the leak, which it was trying to do. The problem for Schwarz lies in the fact that while it worked for several weeks to fix the leak, the southern loop of the sprinkler system was shut down except for those occasional times when Pillow opened the curb box valve. When not exercising this valve, it was left in the closed position, which undisputedly caused that loop not to be in "complete working order" as required in part (b). Schwarz was warranted, indeed obligated, to try and fix the leak, but where it failed to meet its obligations under the insurance policy in this case was that at all times except when Pillow was exercising the curb box valve, the southern loop was shut down and not in "complete working order." Therefore, regardless of whether Schwarz was excused from its obligation to notify Underwriters, it plainly breached a separate obligation to keep the sprinkler system in "complete working order."[5]

---

[5] Finally, it could be argued that the 48 hour exception does not even apply to the Protective Safeguards Endorsement. By its express terms, the 48 hour exception only applies to an "Automatic Sprinkler System," which is a defined term designated "P-1" on the face of the endorsement. But the endorsement in this case does not concern P-1, or for that matter the protective safeguards designated as P-2, P-3 or P-4. Rather, it only applies to P-9, which is described merely as a "Sprinkler System." If one reads the 48 hour exception to be limited to the defined term "Automatic Sprinkler System" appearing at P-1, the 48 hour exception has no application to this endorsement, which only concerns a "Sprinkler System" designated P-9. The undersigned declines to read this endorsement, authored by the insurance company, so narrowly and hypertechnically, however, as it is plain from the evidence that the Plant 2 sprinkler system meets the definition of a "Automatic Sprinkler System."

15

Schwarz urges the court to read the Protective Safeguards Endorsement essentially in two contradictory ways, such that Schwarz is not required to notify Underwriters if it may hypothetically repair the disabled system within 48 hours, but also that it may take more than 48 hours to repair the system, during which time Schwarz may leave the system without sufficient water. Such a reading runs afoul of the Virginia Supreme Court's mandate to "harmonize" the provisions of a Protective Safeguard Endorsement, and the plaint intent of the agreement.

The Court of Appeals of Michigan reached a similar conclusion when reviewing an identical Protective Safeguards Endorsement under very similar facts in <u>Lake States Insurance Co. v. River City Metal Products</u>, No. 244601 & 244602, 2004 WL 1699072 *5 (Mich. Ct. App. July 29, 2004). In <u>Lake States Insurance</u>, Delta, the owner of the building at issue, shut down its sprinkler system because of a leak. <u>Id.</u> at *2. The sprinkler system was thus shutdown at the time of a fire, allowing the fire to spread and cause extensive damage. <u>Id.</u> The repair to the sprinkler system could have been completed in less than 48 hours, but the sprinkler system remained off for nineteen days. <u>Id.</u> at *6. As in this case, the court noted:

> Delta attempts to argue ambiguity in the language of the exclusion. It claims that the language could be construed to mean that Delta did not have to notify [the insurance company] if it <u>could</u> have restored full protection with-in forty-eight hours. In other words, the [Protective Safeguards Endorsement] did not require Delta to restore full function within forty-eight hours, but required notification only if it did not have the capability of restoring function within forty-eight hours.

<u>Id.</u> (emphasis in the original). The Michigan court rejected this argument, stating that it was an "unreasonable" interpretation of the Protective Safeguards Endorsement, and arguing that the Endorsement's requirement for notification be read in conjunction with the requirement that the sprinkler system be maintained. "Read as a whole, there can be no question that the purpose of

16

the [Protective Safeguards Endorsement] was to make sure that the system was operational and that, if it was not, [the insurer] would be notified. It would be ridiculous to accept that [the insured] could indefinitely refrain from notifying [the insurer] because it could have, but chose not to, repair the system within forty-eight hours." Id. at * 6-7. The same rationale applies here.

As such, it is **RECOMMENDED** that summary judgment be **GRANTED** in Underwriters' favor and this action be dismissed.

### 2. Underwriters' Motion for Judgment on the Pleadings.

In this motion, Underwriters essentially argue the substance of their summary judgment motion, and, to that extent, this motion is moot. Underwriters make certain additional arguments as to claimed misrepresentations in the insurance application policy, which the undersigned believes have no merit based on the pleadings alone. For example, Underwriters claim misrepresentation because the policy application asks Schwarz to list construction type, and the form states "Masonry-Noncombustible." Underwriters complain that Schwarz did not note that the structure may contain some wood which could fuel a fire, but certainly Underwriters was on notice of the same as the face of the application indicates that the structure was used as a furniture warehouse. Moreover, one of the Underwriters' own reports indicates that the building had masonry non-combustible construction. (Exhibit B to Underwriters' Answer, Docket # 7, at 3.) Thus, at the very least, a factual issue exists on this issue. Likewise, there is no evidence to suggest that the statement in the application that the building was "fully sprinklered" was false at the time of the application, March 10, 2005, as the earliest evidence of the leak in the system was from the October, 2005 period. As to the final claimed misrepresentation concerning the building's square footage, certain of Underwriters own documents support the number in the

17

application, also creating a fact issue. For these reasons, it is **RECOMMENDED** that the Motion for Judgment on the Pleadings be **DENIED**.

### 3. Schwarz Motion for Partial Summary Judgment on Damages.

Given the **RECOMMENDATION** as to Underwriters' Motion for Summary Judgment, it is **RECOMMENDED** that Schwarz's Motion for Partial Summary Judgment as to Damages be **DENIED** as moot. However, to the extent the court disagrees with the recommendation as to summary judgment, the undersigned would **RECOMMEND** that Schwarz's Motion for Partial Summary judgment be **GRANTED** as follows:

Schwarz contends in its Motion for Partial Summary Judgment as to Damages that, to the extent that its fire loss is covered under the Policy, it is entitled to recover 99.58% of the total insurance limit of $1.005 Million.[6] Underwriters assert that they have a contractual right to subrogation of Schwarz's claims against Capitol Indemnity and Mark Morris, for which there was a settlement agreement reached of $500,000. Va. Code Ann. § 38.2-2105 requires that fire insurance policies require include the following term: "[t]his Company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this Company." The contract section cited by Underwriters provides that "[i]f a person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our

---

[6] Although in its Motion for Partial Summary Judgment as to Damages (Docket # 68) Schwarz asserted that they were entitled to 100% of the insurance limit, it had previously stipulated the exclusion of .4167% of the claim that was insured by an Underwriter's Name living in Virginia to preserve complete diversity of the parties. Following Underwriters identification of this issue in Underwriters' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Docket # 80), Schwarz corrected and reduced the asserted claim in the Reply Memorandum in Support of Their Motion for Partial Summary Judgment as to Damages (Docket # 87).

18

payment." (Exhibit B to Exhibit 1 to Underwriters' Motion to Amend, Docket # 62, at 23.)[7] The parties' disagreement, turns then, on whether Schwarz must be made whole before Underwriters becomes entitled to funds paid by the third-party tortfeasor.

Underwriters' argument for the subrogation of Schwarz's claims against Capitol Indemnity and Mark Morris, and the resulting $500,000 credit, is unavailing. The general equitable rule is that subrogation is permitted only after the insured has been fully compensated for all of the loss that the insured has suffered, i.e., after the insured has been made whole. See Lee R. Russ & Thomas F. Segalla, Couch on Insurance, § 223:134 (3rd ed. 1997) ("[T]he general rule under the doctrine of equitable subrogation is that where an insured is entitled to receive recovery for the same loss from more than one source, e.g., the insurer and the tortfeasor, it is only after the insured has been fully compensated for all of the loss that the insurer acquires a right to subrogation. . . .") In Virginia, this rule has been adopted in various subrogation circumstances. See White v. Nationwide Mutual Ins. Co., 361 F.2d 785, 787 (4th Cir. 1966) (Insurance company as uninsured motorist endorser may not seek subrogation until injured insured is made whole, even if injured party partially recovers from uninsured motorist). See also Martin v. State Farm Mut. Ins. Co., 375 F.2d 720, 722 n.2 (4th Cir. 1967) (reiterating rule in context of uninsured motorist case); Obici v. Furcron, 160 Va. 351, 360-62, 168 S.E. 340, 343-44 (1933) (junior mortgagee could not be subrogated for senior mortgagee's claims until other senior creditors were made whole). Moreover, the majority rule across the country also endorses this approach, including cases of underinsured buildings damaged by fire. See Wimberly v. American Cas. Co. of Reading, Pa., 584 S.W.2d 200, 203 (Tenn. 1979) (in matter containing

---

[7] Neither party addresses whether the subrogation clause in the policy complies with Virginia law. However, because the undersigned concludes that subrogation is not appropriate here, the court need not reach this issue.

Case 6:07-cv-00042-NKM-mfu   Document 103   Filed 08/31/09   Page 19 of 22   Pageid#: 2867

subrogation clause like that in Va. Code Ann. § 38.2-2105, insurer had no subrogation right to the recovery from the tortfeasor, where underinsured restaurant was destroyed by fire for total loss of $44,000 dollars and recovery from insurance and tortfeasor totaled only $40,000). See also Winkelmann v. Excelsior Ins. Co., 85 N.Y.2d 577, 581, 650 N.E.2d 841, -- (N.Y. 1995) (where, in a situation nearly identical to the instant case, the New York Court of Appeals held that if "sources of recovery ultimately available are inadequate to fully compensate the insured for its losses, then the insurer – who has been paid by the insured to assume risk of loss – has no right to share in the proceeds of the insured's recovery from the tortfeasor").

The precedent cited by Underwriters at the hearing in this motion, Brighthope Railway Co. v. Rogers, For. & C., 76 Va. 443 (1881), is inapposite. In Brighthope, the insurer was permitted to pursue a subrogation claim precisely because the injured party's "claim [of $1,000] was compromised by the payment of $701.51 by the insurance company." Id. at 443. The injured party accepted that partial payment of his claim and considered it to be one that made him whole. Only because the insured was made whole was the insurer permitted to pursue the subrogated claim against the tortfeasor. Underwriters' Brighthope argument was considered and rejected by the Fourth Circuit in White v. Nationwide. "[L]earned counsel has entirely misconceived the case to which he has referred. Id. "[T]he creditor was 'fully satisfied' . . . . This is not analogous to payment for only part of a loss." 361 F.2d at 787 n.1. There can be no suggestion that Schwarz agreed that the payment from Morris and Capitol Indemnity was meant to fully compensate it for the loss. Thus, this settlement is distinguished from Brighthope because this was merely a partial payment for a much greater loss.

Finally, Underwriters' argument on public policy grounds also is unsuccessful. Although it may well be the case that Schwarz underinsured Plant 2, this is an insufficient rationale to

permit the Underwriters to subrogate Schwarz's claim and receive a credit of $500,000. Underwriters could have protected against the particular danger of under-insurance by requiring a co-insurance clause.[8] Moreover, the equitable rationales for subrogation are generally acknowledged to be (1) preventing the injured party's windfall from double recovery and (2) avoid the injustice of the tortfeasor receiving a windfall by escaping any payment while the innocent insurer shoulders the entire burden. Neither of these rationales apply here.

It is uncontroverted that the loss by Schwarz is greater than the combined total of the settlement with Morris and Capitol Indemnity and the full amount of the limit on the insurance policy with Underwriters. Hence, Schwarz cannot be made whole. Pursuant to Virginia law, and in accordance with both the majority rule in the United States as well as the public policy underlying subrogation, Underwriters are not subrogated to Schwarz's claim and cannot receive a credit of $500,000 on whatever payment they may be obligated to make.

## SUMMARY RECOMMENDATION

Accordingly, for the foregoing reasons, it is **RECOMMENDED** as follows:

1. Underwriters' Motion for Leave to Amend Counterclaim (Docket # 62) be **DENIED**.

2. Underwriters' Motion for Summary Judgment (Docket # 70) be **GRANTED**.

3. Underwriters' Motion for Judgment on the Pleadings (Docket # 60) be **DENIED** as moot.

---

[8] See Real Asset Management, Inc. v. Lloyd's of London, 61 F.3d 1223, 1226 (5th Cir. 1995) (explaining that "many property insurers use co-insurance clauses, especially in connection with coverage for commercial buildings, to encourage insurance purchasers to acquire coverage that is close or equal to full value of the property") (citing Robert E. Keeton & Alan I. Widiss, Insurance Law 20 (1988)).

Case 6:07-cv-00042-NKM-mfu    Document 103    Filed 08/31/09    Page 21 of 22    Pageid#: 2869

4.   Schwarz's Motion for Partial Summary Judgment on Damages (Docket # 68) be

**DENIED** as moot.

The Clerk is directed to transmit the record in this case to Honorable Norman K. Moon, United States District Judge.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk is directed to send copies of this Report and Recommendation to counsel of record for the parties.

Enter this 31st day of _____ August _____, 2009.

_____
Michael F. Urbanski
United States Magistrate Judge

Case 6:07-cv-00042-NKM-mfu   Document 103   Filed 08/31/09   Page 22 of 22   Pageid#: 2870