CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

DEC 29 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

SCHWARTZ & SCHWARTZ OF VIRGINIA,
LLC, AND
SCHWARTZ & SCHWARTZ, LLC,

                                        *Plaintiffs,*

v.

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON WHO SUBSCRIBED TO POLICY
NUMBER NC959,

                                        *Defendant.*

CASE NO. 6:07-cv-00042

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court upon the Report & Recommendation of the United States Magistrate Judge (docket no. 103), the Objections to the Report & Recommendation filed by Defendant, Certain Underwriters at Lloyd's, London Who Subscribed to Policy Number NC959 (hereinafter "Underwriters") (docket no. 110), the Objections to the Report & Recommendation filed by Plaintiffs, Schwartz & Schwartz of Virginia, L.L.C., and Schwartz & Schwartz L.L.C. (hereinafter "Schwartz") (docket no. 112), and the subsequent responses thereto (docket nos. 113 and 114), and the supplementary Notice of New Authority in Support of Plaintiffs' Pending Objections to the Report & Recommendation (docket no. 115), and Defendant's Response thereto (docket no. 116).

For the following reasons, the Report & Recommendation of the United States Magistrate Judge (docket no. 103) is hereby adopted and affirmed in its entirety: Underwriters' Motion for Leave to Amend Counterclaim (docket no. 62) is hereby denied, Underwriters' Motion for Summary Judgment (docket no. 70) is hereby granted, and Underwriters' Motion for Judgment on the

- 1 -

Pleadings (docket no. 60) and Schwartz's Motion for Partial Summary Judgment as to Damages (docket no. 68) are hereby denied, as moot.

## I. BACKGROUND

The underlying dispute in this matter concerns insurance coverage for a fire that occurred on November 11, 2005, at a former Lane Furniture warehouse located at 301 Pittsylvania Avenue in Altavista, Virginia, (hereinafter "Plant 2" or "the warehouse"), which was owned by Schwartz and insured by Underwriters. On April 29, 2005, Underwriters issued commercial property insurance (Policy No. NC959) (hereinafter "the Policy") covering the warehouse with an effective policy period from March 26, 2005, to March 26, 2006. Schwartz filed a Complaint on October 19, 2007, seeking, *inter alia*, a declaratory judgment that the property damage to this warehouse caused by the fire was covered under the terms of the Policy.

Principally at issue now is the state in which Schwartz maintained the warehouse's sprinkler system for fire protection, and the effect thereof upon the coverage due Schwartz under the terms of the Policy. In the box entitled "Premises Fire Protection" on the Application for insurance coverage, Schwartz had indicated that the Premises were "Fully Sprinklered." Exhibit A to Complaint, docket no. 1, at 3. Based upon this statement in the Application, the Policy contained a Protective Safeguards Endorsement applicable to Schwartz's sprinkler system, which provided the following coverage exclusion:

> We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:
>
> (a)     Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or
>
> (b)     Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

> If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

Exhibit B to Complaint, docket no. 1, at 27. The Schedule to the Protective Safeguards Endorsement, on the prior page, includes as a listed protective safeguard, "Sprinkler System," and provides that "[a]s a condition of this Insurance, you are required to maintain the protective devices or services listed in the Schedule above." *Id.* at 26.

Underwriters' position is that the exclusion in this Protective Safeguards Endorsement applies and that no coverage is owed Schwartz for the fire loss because (1) it did not maintain the sprinkler system in complete working order; and (2) it did not notify Underwriters that part of the sprinkler system had been turned off in the preceding weeks in an effort to identify the leak. However, Schwartz's position is that it did maintain the sprinkler system in complete working order, and further, that it was not required to notify Underwriters about the leak in the sprinkler system because it could have been restored to full protection within 48 hours. Therefore, Schwartz argues, the terms of the Protective Safeguards Endorsement were satisfied and the damage caused to the warehouse was covered under the Policy.

The following motions were referred to the United States Magistrate Judge: Underwriters' Motion for Leave to Amend Counterclaim (docket no. 62); Underwriters' Motion for Judgment on the Pleadings (docket no. 60); Underwriters' Motion for Summary Judgment (docket no. 70); and Schwartz' Motion for Partial Summary Judgment as to Damages (docket no. 68). The Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), rendered proposed findings of fact and recommendations for disposition to this Court, in which it was recommended that Underwriters' Motion for Summary Judgment be granted and that the remaining motions be denied.

## II. Standard of Review

Pursuant to Federal Rule of Civil Procedure 72, either party was permitted to submit objections to the Magistrate Judge's ruling to the District Court within ten days of service of the order.[1] Fed. R. Civ. P. 72; *see also* 28 U.S.C. § 636(b). As a general rule, the standard of review applied by this Court depends upon whether the issue decided by the Magistrate Judge is dispositive or nondispositive of the litigation. For dispositive matters, the Court will undertake a *de novo* review of those portions of the report and recommendation to which objections were made. Fed. R. Civ. P. 72(b)(3); *see also Orpiano v. Johnson*, 687 F.2d 44, 47-48 (4th Cir. 1982). For nondispositive matters, the Court reviews a decision of the Magistrate Judge for whether it is "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a); *see also Proa v. NRT Mid Atlantic, Inc.*, 633 F.Supp.2d 209, 212 (D. Md. 2009) (citing *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1113 (3d Cir. 1986), *cert denied*, 484 U.S. 976, 108 S.Ct. 487 (1987)).

A motion to amend, whether it is in reference to a complaint, or in this case, a counterclaim, is generally viewed as a nondispositive motion. *See e.g., Hall v. Norfolk S. Ry. Co.*, 469 F.3d 590, 595 (7th Cir. 2006) ("The district judge correctly held that the magistrate judge's denial of Hall's motion to amend his complaint was nondispositive, subject only to review for clear error."); *Pagano v. Frank*, 983 F.2d 343, 346 (1st Cir. 1993). *See also Everett v. Cherry*, --- F.Supp.2d ----, 2009 WL 4307449, at *1 n.4 (E.D. Va. 2009); *United States v. Sensient Colors, Inc.*, --- F.Supp.2d ----, 2009 WL 2222798, at *2 n.5, *15 (D. N.J. 2009) (finding magistrate judge's denial of defendant's motion to amend its responsive pleading to include, *inter alia*, a counterclaim, would be overturned only if found to be clearly erroneous or contrary to law). The other motions presently before the Court,

---

[1] The Court notes that henceforth, pursuant to Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b), effective December 1, 2009, parties will be afforded fourteen days from service with a copy of the recommended disposition to file their objections thereto. However, these amendments are inapplicable to the case at hand, as there is

which are Underwriters' Motion for Judgment on the Pleadings and Motion for Summary Judgment, and Schwartz's Motion for Partial Summary Judgment as to Damages, are undeniably dispositive motions.

Pursuant to the Pretrial Order, entered December 17, 2007 (docket no. 10), "[a]ll nondispositive pretrial motions and issues," including Underwriters' Motion for Leave to Amend Counterclaim, were referred to the Magistrate Judge "pursuant to 28 U.S.C. § 636(b)(1)(A)." Pursuant to the Orders dated July 17 and 22, 2009 (docket nos. 67 and 72), the Court referred to the Magistrate Judge the aforementioned dispositive motions "[p]ursuant to 28 U.S.C. § 636(b)(1)(B)." In the Report & Recommendation, however, the Magistrate Judge bundled all of the motions presently at issue and explicitly made recommendations on their disposition "pursuant to 28 U.S.C. § 636(b)(1)(B)." Therefore, the Magistrate Judge could have entered an order disposing of Underwriters' Motion for Leave to Amend as a nondispositive motion that had been referred under the Pretrial Order, which would have been reviewable by the Court for whether it was "clearly erroneous" or "contrary to law." However, this deferential standard of review is predicated upon the Magistrate Judge issuing an order, or making a determination or a ruling on the nondispositive motion. *See* 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's *order* is clearly erroneous or contrary to law."); Fed. R. Civ. P. 72(a) (providing that "[t]he district judge in the case must consider timely objections and modify or set aside any part of the *order* that is clearly erroneous or is contrary to law"). Because the Magistrate Judge's recommended disposition as to the Motion for Leave to Amend Counterclaim did not have the force of law, *see* 91 C.J.S. *United States Magistrates* § 9 (2009) (noting that "a magistrate's report and recommendation does not have the

no dispute over whether objections were timely filed, and the Report & Recommendation was issued before the date of

force of law"), the Court applies the same standard of review to the recommendations on that nondispositive motion as it applies to the recommendations on the dispositive motions.

Consequently, the Court will review *de novo* the Magistrate Judge's recommended disposition as to all referred motions, as articulated in the Report & Recommendation.

III. DISCUSSION

A. Motion for Leave to Amend Counterclaim

On July 8, 2009, Underwriters moved for leave to amend its Counterclaim to include causes of action for declaratory relief that the Policy is void (Proposed Counts I and II) and a cause of action for rescission (Proposed Count III), all of which are based upon allegedly material misrepresentations made by Schwartz in its Application for insurance coverage. Further, Underwriters sought to include state law causes of action for fraud (Proposed Counts IV and V) and unfair and deceptive trade practices (Proposed Count VI) based upon their allegation that false statements have been knowingly and intentionally made by Schwartz: (1) in the Application for coverage; (2) in the insurance claim submitted to Underwriters; and (3) that continued to be reiterated in the resulting claim investigation and throughout the course of this litigation.

Specifically in support of these proposed causes of action, Underwriters allege that in its Application for insurance coverage, Schwartz misrepresented that the property was 500,000 square feet and was two stories, that the property was "Masonry-Noncombustible," and that it had a fully functional sprinkler system. Exhibit 16 to Motion to Amend, docket no. 62, at ¶¶ 25-28. Regarding the positions taken by Schwartz in the insurance claim and throughout the subsequent proceedings, it is alleged that Schwartz has falsely denied that prior to and during the fire, the sprinkler system was impaired, suspended, or had been turned off and drained to avoid freezing. Instead, Underwriters

the Rule 72 amendments.

allege that Schwartz has falsely claimed that the sprinkler system was in complete working order. *Id.* at ¶¶ 29-32.

The only issue presently before the Court on this Motion is whether Underwriters should be permitted to include Proposed Counts IV through VI in their Counterclaim.[2] These counts, which allege common law fraud under Virginia law (Proposed Count IV), under North Carolina law (Proposed Count V), and allege the violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen.Stat. §75.1.1 *et seq.* (hereinafter "UDTPA"), are warranted according to Underwriters essentially because Schwartz takes the position that the sprinkler system was in working order at the time of the fire. In the Report & Recommendation, the Magistrate Judge found that Underwriters' position rests heavily upon: (1) an email produced in discovery dated October 18, 2005 by Property Manager Sean Pillow (the Schwartz employee responsible for maintaining the sprinkler system), which states that "[t]he rest of the system of underground loops that are normally off was checked for flow at the drain of each riser and at a hydrant for each loop (North, East, South). These loops are dry and have no water in any of them;" (2) documents from the several fire departments that responded to the fire, which indicate that Pillow said on the night of the fire that all or part of the sprinkler system had been shut off and drained; and (3) the June 16, 2009 deposition testimony of Altavista Fire Chief John Tucker. *See* Report & Recommendation, at 7. The Magistrate Judge, however, found that the alleged factual basis for the proposed amendments to the

---

[2] The Magistrate found that Proposed Counts I through III were untimely, and also unnecessary because Underwriters had, in their Sixteenth Affirmative Defense, "preserved as a defense in this case their assertions that Schwartz has made misrepresentations in its insurance application or fire loss claim." Report & Recommendation, at 6-7. Based upon the Magistrate's determination that the declaratory relief sought by Underwriters was duplicative of that asserted in their Affirmative Defenses, no objection was made to the Magistrate's recommendation that leave not be granted for Underwriters to amend their Counterclaim to include Proposed Counts I through III. *See* Objections of Underwriters to the Report & Recommendation, at 1-2 n.1 (stating that Underwriters "object only to Judge Urbanski's recommendation that [they] be precluded from seeking affirmative relief through Counterclaims for fraud and violations of the North Carolina Unfair Trade Practices Act"). The Court concurs with the Magistrate Judge's recommendation on this issue for the reasons set forth in the Report & Recommendation, and holds that Underwriters shall not have leave to amend their Counterclaim to include Proposed Counts I through III.

Counterclaim comprised the same facts "that had been known by or available to Underwriters for several years." *Id.* at 8. For example, the emails from Pillow had been attached to the original Counterclaim, and Underwriters had been aware since the beginning of their investigation that the Fire Marshal and Chief Tucker believed the sprinkler system was shut off at the time of the fire. *Id.* As a result, the Magistrate Judge drew the following conclusion about the timing of Underwriters' proposed amendment to the Counterclaim.

> Underwriters took pains to investigate this claim for nearly two years before they denied coverage, and they can hardly say they were surprised by anything learned in discovery. In short, it is clear that as early as the filing of the original Counterclaim, Underwriters had all the information they needed to file the proposed amendment. As such, their filing after the close of discovery some eighteen months later is simply too late.

*Id.* at 9.

To contest the recommendation that their proposed amended Counterclaim was untimely, Underwriters hang their hat on the June 16, 2009 testimony of Altavista Fire Chief John Tucker as providing revelatory evidence that Schwartz had committed fraud. Underwriters argue that they knew "at the start of this litigation in October of 2007 … that there was conflicting factual information about the condition of the sprinkler system between the documents produced and the position being taken by the insureds," but at that time "there was no factual basis at that juncture to suggest that the insureds were *knowingly and intentionally* creating that conflict to fraudulently secure the insurance proceeds." Objections of Underwriters to the Report & Recommendation, at 9. Some evidence apparently suggested that there was uncertainty concerning whether the sprinkler system had been shut off, for example, in Pillow's recorded statement of December 7, 2005, taken on behalf of Underwriters. Other evidence apparently indicated that the system had been turned off

before the fire, for example, in the aforementioned October 18, 2005, email from Pillow to Tim Schwartz. When this litigation was commenced, Underwriters argue that they, "properly, did not jump to the conclusion that the insureds were committing fraud simply because of the existence of conflicting recollections about the sprinkler system." Objections of Underwriters to the Report & Recommendation, at 9.

The turning point, according to Underwriters, was much more recent. Their argument is that "it was not until the June 16, 2009, testimony of Altavista Fire Chief John Tucker that Underwriters discovered that Schwartz was knowingly and intentionally being deceitful." *Id.* at 11. They emphasize that "the landscape of this litigation changed drastically after the June 16, 2009, deposition of John Tucker." *Id.* at 2. Specifically, Tucker testified that in a conversation he had with Pillow the night of the fire, Pillow had stated that they had problems with the pipes freezing, that it was too costly to repair the damage caused by freezing pipes, and that as a result Pillow had drained the system. *Id.* at 13. It was at this turning point, Underwriters argue, that they had the requisite factual basis, and "not inadmissible hearsay or unsigned statements of unknown origin, upon which to assert a claim for fraud." *Id.* at 14.

The general rule is that leave to amend a complaint under Federal Rule of Civil Procedure 15(a) should be freely given by the Court. *See* Fed. R. Civ. P. 15(a)(2); *see also Steinburg v. Chesterfield County Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227 (1962)). "Delay alone is not sufficient reason to deny a party leave to amend its pleading," *E.E.O.C. v. Chesapeake Acad., Inc.*, 2009 WL 2767671, at *1 (D. Md. 2009) (quoting *Nat'l Bank of Washington v. Pearson*, 863 F.2d 322, 327 (4th Cir. 1988)), however, when such delay is "accompanied by bad faith on the part of the movant, futility of the proposed

amendment, or prejudice to the non-movant … undue delay is an appropriate ground for a district court's denial of leave to amend." *Nat'l Bank of Washington v. Pearson*, 863 F.2d at 328.

Particularly important to the Court's resolution of Underwriters' Motion for Leave to Amend Counterclaim is the question of whether Schwartz, as the non-movant, would suffer prejudice.

> Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing. A common example of a prejudicial amendment is one that raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant, and is offered shortly before or during trial. An amendment is not prejudicial, by contrast, if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred.

*Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc) (internal quotation marks, brackets, and citations omitted). However, the longer that a party waits in litigation before moving the Court for leave to amend, the more likely that the non-moving party will suffer prejudice. *Cf. id.* ("A moment's reflection reveals, however, that the further a case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant or that a court will find bad faith on the plaintiff's part." (citing *Adams v. Gould*, 739 F.2d 858, 864 (3d. Cir. 1984)).

With the aforementioned principles in mind, the Court directs its attention to the Report & Recommendation, which found and recommended that Underwriters' Motion for Leave to Amend Counterclaim be denied. The Magistrate Judge traced back the purported revelatory evidence that was uncovered by Underwriters as a result of, *inter alia*, their June 16, 2009, deposition of Altavista Fire Chief John Tucker, and found that "it is clear that as early as the filing of the original Counterclaim, Underwriters had all of the information they needed to file the proposed amendment. As such, their filing after the close of discovery some eighteen months later is simply too late." Report & Recommendation, at 9. While the Magistrate Judge clearly articulated the reasons upon which the amendment was considered untimely, the Report & Recommendation contains no explicit

discussion concerning whether Schwartz would suffer prejudice if the Court granted leave for Underwriters to amend their Counterclaim. The Court will address each element in turn.

### 1. Timeliness

The Court agrees with the Magistrate Judge's reasoned determination that Underwriters' proposed amended Counterclaim was untimely. In their argument that the amendment is timely, Underwriters hang their hat on the June 16, 2009, deposition testimony of Altavista Fire Chief John Tucker – principally his statements that in a conversation he had with Pillow the night of the fire, Pillow had stated that they had problems with the pipes freezing, that it was too costly to repair the damage caused by freezing pipes, and that as a result Pillow had drained the system. Objections of Underwriters to the Report & Recommendation, at 13. However, the factual information contained in Tucker's deposition testimony was long known to Underwriters. First and most importantly, as Schwartz points out, in the Initial Loss Advice Executive General Adjuster Report Number One dated December 9, 2005, the agent of Underwriters reported that Fire Chief John Tucker had "positively confirm[ed] that the sprinkler system to the involved structure was shut down and not operating at the time of the fire," and "that the system had been drained to prevent the pipes from freezing." Exhibit E to Schwartz's Opposition to Underwriters' Motion for Leave to Amend Counterclaim, docket no. 74, at 11. Second, by November 24, 2008, a copy of Tucker's written statement, dated March 28, 2007, was made known to Underwriters in discovery. This written statement corroborated the prior description in the Initial Loss Advice that Tucker knew on the night of the fire that the sprinkler system was not turned on because the building was not heated. The information specifically noted by Underwriters as revelatory in the June 16, 2009, deposition of Tucker, *see* Underwriters' Objections to the Report & Recommendation, at 13-14, does not materially differ from – or add to – the information already known to Underwriters in these previous

documents. As such, it is difficult to credit Underwriters' assertions that information recently uncovered in the Tucker deposition changed the landscape of the litigation, or specifically shed a new light on the allegedly incriminating October 18, 2005 email from Pillow to Schwartz.

Underwriters also argue that Tucker's recent deposition offers an additional basis upon which the Court should find their proposed amended Counterclaim to be timely. They argue that "[b]ased upon this testimony, Underwriters had a factual basis, not inadmissible hearsay or unsigned statements of unknown origin, upon which to assert a claim for fraud." *Id.* at 13. Without passing on the merits of Underwriters' proposed counts of fraud, or whether Underwriters could have satisfied the requirement that fraud be pled with particularity, the Court notes that Underwriters were not required to have admissible factual support in hand in order to merely plead fraud in their Counterclaim. Pursuant to Rule 11(b)(3) of the Federal Rules of Civil Procedure, an attorney certifies when presenting a pleading to the Court that "the factual contentions have evidentiary support *or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.*" (Emphasis added). Neither the certification requirement on evidentiary support, nor Rule 11 in its entirety, "require[s] that a claim be proven before a complaint can be filed." *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002) (citing *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 988 (4th Cir. 1987)). Therefore, while it might have been beneficial to Underwriters to have admissible evidence of Schwartz's alleged fraud in anticipation the filing of its Counterclaim, it was not required.

Consequently, Underwriters have not persuaded the Court that evidence that has recently come to light in discovery excused the delay in proposing to amend their Counterclaim, after the close of discovery, and some eighteen months after the filing of the original Counterclaim. For these

reasons and the other reasons articulated in the Magistrate Judge's Report & Recommendation, the Court finds that Underwriters' proposed amended Counterclaim is untimely.

## 2. Prejudice

Noting such undue delay, the Court must address whether Schwartz, as the non-moving party, would suffer prejudice if the Court granted Underwriters' motion to amend. Schwartz argues that it would be unduly prejudiced if Underwriters were permitted to amend, because "serving new document requests, taking new depositions, retaking old depositions, and making new expert disclosures all would be required." Schwartz's Response to Underwriters' Objections to the Report & Recommendation, at 4. The Court agrees with Schwartz that additional discovery would likely be required if it granted Underwriters' Motion for Leave to Amend Counterclaim, and that the result of the amendments would be that Schwartz would face undue prejudice.

In these proposed Counts IV through VI, it is alleged that Schwartz "intentionally and knowingly made false statements to Underwriters concerning the Property and the state of the sprinkler system at the Property at the time Schwartz applied for the Policy, submitted the insurance claim for the November 11, 2005, fire loss, *and in connection with ... this litigation*." Exhibit 16 to Motion to Amend, docket no. 62, at ¶¶ 84, 90, 96 (emphasis added). By raising the allegations of fraud after discovery was closed, the Court recognizes that the parties would likely be required to conduct new depositions and new discovery on (at least) this separate and additional question now raised by Underwriters: whether, throughout the course of this litigation, the witnesses for Schwartz have perpetuated a fraud by maintaining the position that the sprinkler system was in working order prior to the fire. The court in *Laber* has stated that "[a] common example of a prejudicial amendment is one that raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant, and is offered shortly before or during trial." 438 F.3d at 427. Contrast

this with the *Laber* court's description that "[a]n amendment is not prejudicial ... if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred." *Id.* The Court finds that the circumstances surrounding Underwriters' Motion for Leave to Amend more closely approximate the former rather than the latter example. Underwriters attempt to raise new legal theories of fraud and unfair and deceptive business practices over a year and a half after the Complaint was filed, and after the close of discovery. These new legal theories would also likely require a significant amount of new discovery – in the form of witness interviews and depositions – on Underwriters' additional allegation that a fraud has been perpetuated throughout the course of this litigation. Courts have routinely recognized that allowing an amendment after the close of discovery contributes to a finding of prejudice to the non-moving party. *See e.g.*, *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) ("At least one Sixth Circuit decision has held that allowing amendment after the close of discovery creates significant prejudice, and other circuits agree.") (citing authorities from the First, Second, Third, Sixth, Seventh, and Eleventh Circuits).

This is not a situation where the party moving to amend simply seeks to add specificity to allegations already made. *See e.g.*, *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 195 (4th Cir 2009) (noting in support of court's holding that leave to amend should be granted, the fact that "[p]laintiffs simply seek to add specificity to scienter allegations in a situation where defendants are aware of the circumstances giving rise to the action"); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (noting that merely adding specificity to allegations generally does not cause prejudice to the opposing party). In this case, Underwriters had initially raised in their Counterclaim only one count, which was for declaratory relief that "there is no coverage under Policy No. NC959 for this incident." Underwriters' Answer and Counterclaim, docket no. 7, ¶ 39. Now, Underwriters have attempted to bring forth a total of six counts in their proposed amended

Counterclaim, three of which are legal theories upon which they believe they are affirmatively entitled to recoup monetary damages from Schwartz due to alleged fraud or unfair and deceptive business practices. In addition to the burden of additional discovery obligations that would be placed upon Schwartz, it would also face the burden of having to prepare an additional litigation strategy to respond to Underwriters' allegations that it has committed fraud throughout the course of this litigation because of its position that the sprinkler system was in working order. This burden to respond to additional legal theories proposed in Underwriters' proposed amended Counterclaim, is a factor properly considered in the Court's inquiry on whether the non-moving party would suffer prejudice. *See e.g., Watkins v. Farmers and Merchants Bank*, 237 F. App'x 591, 593 (11th Cir. 2007) (holding that a proposed amendment that would have "included new parties and a host of new claims ... after the close of discovery would have resulted in considerable prejudice to the defendants"); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387-88 (9th Cir. 1990) (affirming denial of leave to amend to add claims advancing different legal theories and requiring proof of different facts); *see also Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (6th Cir. 1973), *cert denied*, 94 S.Ct. 1942 (1974) (noting that after defendant has defended a suit against one theory in the district court and on appeal, "to put [defendant] through the time and expense of continued litigation on a new theory, with the possibility of additional discovery," could justifiably be considered "manifestly unfair and unduly prejudicial").

The Court therefore finds that permitting Underwriters to amend their Counterclaim, after the close of discovery and after such a lengthy delay, would result in undue prejudice to Schwartz, at least in the form of the additional discovery likely required to adequately defend against the new allegations of fraud, and in the form of additional resources required to prepare a separate litigation strategy to contest these allegations. As Underwriters unduly delayed bringing their proposed

amended Counterclaim, and as Schwartz would suffer undue prejudice if leave were given for the amended Counterclaim, the Court hereby adopts the recommendation of the Magistrate Judge for these reasons and the other reasons articulated in the Report & Recommendation, and denies Underwriters' Motion for Leave to Amend Counterclaim.

## B. Motion for Summary Judgment

On July 20, 2009, Underwriters filed their Motion for Summary Judgment (docket no. 70), which was also referred to the Magistrate Judge. In the Report & Recommendation, the Magistrate Judge found that there was no dispute as to the following facts: (1) "that in the weeks leading up to the fire, the southern loop of the sprinkler system in Plant 2 was leaking and that portions of it were shut off to try to isolate and repair the leak," and (2) "Schwartz never notified Underwriters of either the leak or the shutdown." Schwartz knew that the sprinkler system was impaired due to the leak and shut down, and did not maintain the system in complete working order, and therefore, the Magistrate Judge concluded that Schwartz failed to satisfy the requirements of both part (a) and part (b) of the Policy's Protective Safeguards Endorsement. Report & Recommendation, at 9-10.

The crux of Schwartz's argument is that the 48-hour exception in the Protective Safeguards Endorsement applied and that no notice to Underwriters was required, because Plant 2 *could have been* restored to full protection within 48 hours, and in fact was restored to full protection when Pillow exercised the curb box valve each day. The Magistrate Judge rejected this argument, responding as follows:

> Schwartz views the term "restore full protection" only from the standpoint of whether water flowed through the southern loop of the sprinkler system at some point during each 48 hour period. ... But this is a fire insurance policy. Fires do not happen only during normal business hours when Sean Pillow may be exercising the curb box valve. Full protection, in the context of a fire insurance policy, must mean more than the sprinkler pipes are capable of being temporarily filled with water during normal business hours. *Rather, the "ordinary*

> and accepted" meaning of "restore full protection" must have a
> temporal component, that the sprinkler system is providing protection
> at all times.

Report & Recommendation, at 11 (emphasis added). Having concluded that the 48-hour exception to the Protective Safeguards Endorsement was inapplicable, the Magistrate Judge found that Schwartz had failed to meet its obligations under part (a) of the exclusion by failing to notify Underwriters of the suspension of the sprinkler system, and as a result, Underwriters were not liable for the fire loss. *See* Report & Recommendation, at 12-14. Separately, the Magistrate Judge found that Schwartz had also failed to meet its obligations under part (b) of the exclusion, and therefore, Underwriters were not liable for the fire loss under that provision. Part (b) of the exclusion required Schwartz to "maintain" the sprinkler system in "complete working order." Because the southern loop was shut down and not "maintain[ed]" in "complete working order" at all times (except when Pillow was exercising the curb valve box), Schwartz had plainly breached a separate obligation to keep the sprinkler system in "complete working order." *See* Report & Recommendation, at 14-15.

Federal Rule of Civil Procedure 56(c) provides that a court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As to materiality ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the

evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250.

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

Schwartz raises numerous objections to the Report & Recommendation of the Magistrate Judge. The Court will first address the disputed questions of law regarding the 48-hour exception, and whether there is an issue of material fact about its application. Next, the Court will address disputed questions of law regarding part (a) and part (b) of the Protective Safeguards Endorsement exclusion, and whether there is an issue of material fact about their application.

### 1. 48-Hour Exception to the Exclusion

The first question is whether the 48-hour exception to the coverage exclusion required full protection of the sprinkler system *to actually have been restored* within 48 hours, or whether it merely required *the ability to restore* full protection within 48 hours. Schwartz argues that the Report & Recommendation erroneously adopted Underwriters' interpretation of the 48-hour exception. It contends that "[t]he language in [this exception] is not that full protection *must be* or *is* or *was* restored within 48 hours," as the Magistrate Judge recommended, "but rather that full

protection *can be* restored within 48 hours." Schwartz's Objections to the Report & Recommendation, at 6 (emphasis in original). Under this exception, Schwartz argues that "[t]he insured is asked to make a judgment call as to whether or not full protection can be restored within 48 hours. If so, there is no need to notify Lloyd's." *Id.* at 7.

The interpretation of the language of the Protective Safeguards Endorsement is a question of law properly before the court, as under Virginia law, insurance policies are to be interpreted in the same manner as other contracts. *See Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004) (noting that "pursuant to Virginia jurisprudence, an insurance policy is a contract to be construed in accordance with the principles applicable to all contracts"); *Seals v. Erie Ins. Exchange*, 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009). When a court interprets an insurance policy, "the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., Inc.*, 240 Va. 457, 459, 397 S.E.2d 876, 877 (1990). "As with other contracts, when interpreting a policy courts must not strain to find ambiguities." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (citing *Salzi v. Virginia Farm Bureau Mut. Ins. Co.*, 236 Va. 52, 556 S.E.2d 758, 760 (2002)). Neither should courts "examine certain specific words or provisions in a vacuum, apart from the policy as a whole." *Id.* (citing cases). Instead, "[e]ach phrase and clause of an insurance contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein." *Seals*, 277 Va. at 562 (quoting *Floyd v. N. Next Ins. Co.*, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993)).

If, after such rules of construction are applied, an ambiguity still exists in the policy, the court must construe it against the insurer, because insurance companies "bear the burden of making

their contracts clear." *Res. Bankshares Corp.*, 407 F.3d at 636-37 (citing, *e.g., Ocean Accident & Guar. Corp. v. Washington Brick & Terra Cotta Co.,* 148 Va. 829, 139 S.E. 513, 517 (1927) ("It is a well recognized rule that insurance policies, in case of doubt, should be construed most strongly against the insurer. But this does not authorize the court to make a new contract for the parties, nor to adopt a construction not justified by the language or intent of the parties.")).

### i. *"Can Restore* Full Protection"

With respect to the 48-hour exception, the operative language principally in dispute is what the Policy means when it provides that "notification to [Underwriters] will not be necessary if you can restore full protection within 48 hours." Schwartz makes a textual argument in support of its position, specifically contending that "[t]he language in the 48 Hour Exception is not that full protection *must be* or *is* or *was* restored within 48 hours, but rather that full protection *can be* restored within 48 hours." Schwartz's Objections to the Report & Recommendation, at 6. So interpreted, Schwartz concludes that it falls within the terms of the 48-hour exception, because "Schwartz at all times was fully capable of reopening the curb box within a matter of minutes or even seconds (much less than 48 hours)." *Id.* at 4. Furthermore, according to Schwartz, the 48-hour exception provides relief from both part (a) and part (b) of the exclusion. "[E]ven assuming, *arguendo,* that part (a) or part (b) of this exclusion is applicable, the 48 hour exception ... preserves coverage because part of Schwartz's sprinkler system was isolated due to leakage and Schwartz *could have* restored full protection within 48 hours." *Id.* at 4; *see also id.* at 10 (arguing that "The 48 Hour Exception Applies To Both Part (A) And Part (B)").

The Court does not – and need not – dispute Schwartz's linguistic analysis of the word "can," in the 48-hour exception. In its interpretation of this provision, Schwartz effectively "examine[s] certain specific words ... in a vacuum," *Res. Bankshares Corp.*, 407 F.3d at 636, and reaches a result

that is contrary to the maxim that "[n]o word or phrase employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it." *Pocahontas Min. Ltd. Liab. Co. v. CNX Gas Co., LLC*, 276 Va. 346, 353, 666 S.E.2d 527, 531 (2008). If the Court were to assign Schwartz's interpretation to this exception, it would render the notification requirement without a reasonable meaning, and threaten to render the entire exclusion meaningless.

Schwartz argues that under this exception, "[t]he insured is asked to make a judgment call as to whether or not full protection can be restored within 48 hours. If so, there is no need to notify Lloyd's." Schwartz's Objections to the Report & Recommendation, at 7. If the Court adopted Schwartz's interpretation of the 48-hour exception, but concluded that it only applied to part (a) of the exclusion, the following would apparently result: Schwartz could decide to perpetually keep the sprinkler system turned off, and so long as it had made a judgment call that full protection could be restored within 48 hours from any single point in time, no notification to Underwriters would be required.[3] If the Court adopted Schwartz's interpretation of the 48-hour exception, *and* adopted Schwartz's argument that the exception applies to parts (a) and (b) of the exclusion, the following would apparently result: Schwartz could decide to perpetually keep the sprinkler system turned off, and so long as it had made a judgment call that full protection could be restored within 48 hours from any single point in time, no notification to Underwriters would be required, *and* Schwartz would be excused from its obligation in part (b) of the exclusion to maintain the sprinkler system in "complete working order." Neither is a reasonable interpretation of the 48-hour exception. These interpretations might assure some minimal level of protection, *i.e.* that the sprinkler system is in such repair that it inspires the insured's confidence that it could be turned on, and full protection restored,

---

[3] Presumably under this scenario, Schwartz would still recognize that it was required under part (b) of the exclusion to "maintain" the sprinkler system in "complete working order." Notably, under the facts of this case, Schwartz maintains that it did not fail to "maintain" the sprinkler system in "complete working order." *See e.g.*, Schwartz's Objections to the

within 48 hours. But neither interpretation offered by Schwartz assures that Underwriters will reasonably receive notice of suspensions or impairments in the sprinkler system, as even a perpetual shut-down of the sprinkler system would not require notice. *See Lake States Ins. Co. v. River City Metal Prods.*, No. 244601 & 244602, 2004 WL 1699072, at *6-7 (Mich. Ct. App. July 29, 2004) ("Read as a whole, there can be no question that the purpose of the [Protective Safeguards Endorsement] was to make sure that the system was operational and that, if it was not, [the insurer] would be notified. It would be ridiculous to accept that [the insured] could indefinitely refrain from notifying [the insurer] because it *could* have, but chose not to, repair the system within forty-eight hours."). Schwartz's latter interpretation (applying the 48-hour exception to parts (a) and (b) of the exclusion) additionally would not assure that the sprinkler system will ever actually be turned on, and it certainly does not assure that it would be turned on when necessary – before the threat of fire. The practical shortcomings of Schwartz's interpretations are manifest, because "[f]ires do not happen only during normal business hours when Sean Pillow may be exercising the curb box valve," Report & Recommendation, at 11, and "[o]ne does not normally have 48 hours notice of when a fire will occur." Underwriters' Response to Schwartz's Objections to the Report & Recommendation, at 11.

Giving the words in the 48-hour exception to the exclusion their ordinary and customary meaning, there is only one reasonable interpretation of the language, "notification to [Underwriters] will not be necessary if you can restore full protection within 48 hours." This language in the exception simply and reasonably provides that notification to Underwriters is not necessary if full protection is restored within 48 hours from the time when "part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads."

---

Report & Recommendation, at 6.

### ii. "Can Restore *Full Protection*"

As notification to Underwriters was required if the insured does not "restore full protection within 48 hours," the second question in the interpretation of the 48-hour exception is what does it mean to "restore full protection." The Magistrate Judge had addressed what it means using, in part, the following language.

> Schwartz views the term "restore full protection" only from the standpoint of whether water flowed through the southern loop of the sprinkler system at some point during each 48 hour period. ... But this is a fire insurance policy. Fires do not happen only during normal business hours when Sean Pillow may be exercising the curb box valve. Full protection, in the context of a fire insurance policy, must mean more than the sprinkler pipes are capable of being temporarily filled with water during normal business hours. Rather, the "ordinary and accepted" meaning of "restore full protection" must have a temporal component,[4] that the sprinkler system is providing protection at all times.

Report & Recommendation, at 11.

Schwartz contends, even assuming *arguendo* that its interpretation was incorrect on the point of law in the preceding section, that "coverage still would be preserved ... because part of Schwartz's sprinkler system was isolated due to leakage and Schwartz, in fact, restored full protection within 48 hours." Schwartz's Objections to the Report & Recommendation, at 4. Schwartz objects to the Magistrate Judge's characterization of the term "restore full protection" as one that contains a "temporal component," arguing that the rationale behind such a characterization is unclear. *Id.* at 8-10.

---

[4] Schwartz extrapolates from this statement in the Report & Recommendation that the Magistrate Judge "found there to be more than one meaning in the Protective Safeguards Endorsement," and that as a result, "the Report was obligated to adopt the construction offered by Schwartz that would afford coverage." Schwartz's Objections to the Report & Recommendation, at 8. The Court finds that the Magistrate Judge's language was clear that the term "restore full protection" was not susceptible to the construction offered by Schwartz.

The term, "restore full protection," is not defined in the Policy, *see* Report & Recommendation, at 11 n.2, and therefore, it "must be given its ordinary and accepted meaning." *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 260 Va. 77, 86, 532 S.E.2d 325, 330 (2000). When courts determine the plain and ordinary meaning of an undefined term within a policy, they will routinely look to dictionary definitions of the term. *See e.g.*, *Spence-Parker v. Md. Ins. Group*, 937 F.Supp. 551, 556 (E.D. Va. 1996). And yet the ordinary and accepted meaning of an undefined term cannot be divined in isolation, but instead is informed by the surrounding context of the insurance policy. *See e.g.*, *CACI Intern., Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 158 (4th Cir. 2009) (writing that the court "can further interpret" an undefined term "by considering its meaning in the context of the policies as a whole") (citing *Res. Bankshares Corp.*, 407 F.3d at 636); *Atlas Underwriters, Ltd. v. Meredith-Burda, Inc.*, 231 Va. 255, 258, 343 S.E.2d 65, 67 (1986) (writing that even though certain terms are not defined in the policy, "we hold that in the context of this insurance contract these crucial words are clear and unambiguous").

With these principles of Virginia contract and insurance law in mind, as well as those previously articulated, the ordinary and accepted meaning of "full protection" in the context of this insurance policy clearly includes a temporal component. "Full" is defined as "complete esp. in detail, number, or *duration*," *Merriam-Webster's Collegiate Dictionary* 471 (10th ed. 1994) (emphasis added). It is also defined as "well supplied, stocked, or provided," as "filling the required number, capacity, measure, etc.; complete," and as "thorough; absolute." *Webster's New World College Dictionary* 564 (2d ed. 1972). To "protect," as the root of "protection," is defined as "to cover or shield from exposure, injury, or destruction," *Merriam-Webster's Collegiate Dictionary*, at 938, or as "to shield from injury, danger, or loss." *Webster's New World College Dictionary*, at 1142. The term "full protection" is also to be construed in its context: within the sentence in which it

is located, within the Protective Safeguards Endorsement, and within the Policy as a whole. Schwartz argues that "[i]t is unclear why a fire context would be a basis for rejection as a matter of law of 'hydrodynamic' terminology. In any event, the Policy is not a 'fire insurance policy.' It is a 37 page policy for commercial property insurance which contains a one page Protective Safeguards Endorsement seeking to modify its terms." Schwartz's Objections to the Report & Recommendation, at 10. Certainly, Schwartz is correct that the Policy is not exclusively a fire insurance policy. However, the immediate surrounding language of the undefined term, "full protection," is of particular importance to the Court's interpretation of that term. *See Res. Bankshares Corp.*, 407 F.3d at 641 (applying, in the context of an undefined term in an insurance policy, "the commonsense canon of construction compelling courts to look to the immediate context of a word or phrase for interpretive guidance"). The plain language of the 48-hour exception and the Protective Safeguards Endorsement as a whole, as all as common sense, unambiguously support the fact that "full protection," in this context includes a temporal component. The purpose of the Protective Safeguards Endorsement is evident, which is ensuring that Schwartz, as the insured, "maintain[ed]" the sprinkler system in "complete working order," and if there was more than a brief interruption (48 hours) in the protection it offered from the risk of fire, that Underwriters would be notified. *See Lake States Ins. Co.*, 2004 WL 1699072, at * 6 ("Read as a whole, there can be no question that the purpose of the [Protective Safeguards Endorsement] was to make sure that the system was operational and that, if it was not, [the insurer] would be notified."). Contrary to Schwartz's assertion, it is clear "why a fire context" is a basis for finding that the term, "restore full protection," has a temporal component. That is because the sprinkler system offers no "protection," much less "full protection," from the threat of fire, when there is no water in the sprinkler pipes. Schwartz's argument that the term, "restore full protection," is without a temporal component is without merit. Similarly, for the same

reasons that "full protection" must have temporal component in the context of fire protection, it also clearly must have a spatial component as well.

### iii. Schwartz Did Not "Restore Full Protection" Within 48 Hours

The following facts were recognized by the Magistrate Judge as undisputed: (1) "the sprinkler system at Plant 2 developed a leak, and [ ] Sean Pillow, the Schwartz employee responsible for that system, was trying to isolate and repair the leak in the weeks preceding the November 11, 2005 fire;" (2) "by the time of the fire, Pillow had isolated the leak to a portion of the southern loop of the sprinkler system, but had not yet made the repairs;" (3) "in order to make the repairs, in the weeks prior to the fire, Pillow attempted to shut off the flow of water to the southern loop of the Plant 2 sprinkler system by closing two control valves, partially closing a third curb box valve and opening a hydrant;" and (4) "Schwartz did not notify Underwriters of the leak in the sprinkler system or that part of the system was shut down to effectuate the repairs at any time prior to the fire." Report & Recommendation, at 2-3. More specifically, the Magistrate Judge found that "Schwartz had the southern loop of the sprinkler system shut off for several weeks in October and November, 2005." And while "there are factual issues as to just how much water was flowing out of the leak, how much water was flowing past the partially closed curb box valve and how much was draining out of the partially open hydrant on the southern loop," he found there to be "no dispute that at the time of the fire this system was partially shut off and was not available to help suppress the fire." *Id*. at 12.

Schwartz objects to the aforementioned findings of fact by the Magistrate Judge, stating that Underwriters' "claim that Schwartz drained and shut off its sprinkler system is contrary to the evidence" because "the sprinkler heads in the fire area immediately began discharging substantial volumes of water to help fight the fire *upon Pillow's reopening of a single control valve that had*

*been closed for maintenance purposes in order to repair a leak.*" Schwartz's Objections to the Report & Recommendation, at 1 (emphasis added). Schwartz states that Pillow had to, "[i]n order to safely repair this leak … depressurize the South loop and isolate it from the remainder of the sprinkler system. Pillow attempted to do this by closing three control valves, but one of those valves referred to as the 'curb box' would not seal properly." *Id.* at 2. Arrangements were made with a contractor "to dig up and repair the leak as soon as the curb box was sealed and it became safe to do so," but "[u]nfortunately, the fire occurred before the curb box could be sealed and the repair could be completed." *Id.* Schwartz concludes that "[t]he fact that Pillow's reopening of the curb box had this effect confirms that Schwartz's sprinkler system was operational and was not (as Lloyd's contends) drained or shut off prior to the fire." *Id.* With respect to the timing of Pillow's efforts to seal the curb box, Schwartz argues that "[t]he curb box never was closed for a 48 hour period," and that it "exercised the curb box on a daily basis and each time it was reopened water fully flowed through the South loop and the entire sprinkler system was fully charged. At the time of the fire, the curb box had been closed for 36 hours or less." *Id.* at 4.

The Court finds that the facts set forth as undisputed in the Report & Recommendation remain uncontroverted, and finds that Schwartz merely objects to the Magistrate Judge's characterization of those facts as showing that Schwartz did not "restore full protection" to the sprinkler system "within 48 hours." However, these undisputed facts clearly warrant the conclusion that Schwartz did not "restore" the sprinkler system to "full protection within 48 hours," and that therefore, the 48-hour exception is inapplicable. Giving the words "restore full protection within 48 hours" their ordinary and accepted meaning, which is informed by the context in which they appear, it is clear that Schwartz's actions fell short of that standard. As previously stated, there is undoubtedly a temporal and a spatial component to the ordinary and accepted definition of "full

protection." It is undisputed that "[t]he sprinkler system to the southern loop was shut down for weeks leading up to the fire at all times except when Pillow was exercising the curb box valve." Report & Recommendation, at 14. The sprinkler system was not left in a charged state overnight, on weekends, and at other times when Pillow was not performing maintenance work on it. *Id.* And furthermore, although Schwartz has maintained that that it did restore full protection every 48 hours "[b]y exercising the curb box on a daily basis," Schwartz's Objections to the Report & Recommendation, at 7, it has not contested Underwriters' assertion that because "Pillow only worked Monday through Friday, the system was shut down for more than 48 hours each weekend." Report & Recommendation, at 4 n.1. The sprinkler system in the southern loop was shut down and not left in a charged state for significant lengths of time, and thus Schwartz clearly did not "restore full protection" to the sprinkler system "within 48 hours," as the ordinary and accepted definitions of those terms would dictate. Similarly, because that the sprinkler system in the southern loop was shut down and not able offer protection from the threat of fire in that proximity (until Pillow exercised the curb box valve), Schwartz did not "restore full protection" to the sprinkler system from the spatial perspective either, as the ordinary and accepted definition of those terms would dictate. As a result, Schwartz does not fall within the terms of the 48-hour exception to the Protective Safeguards Endorsement exclusion.

### 2. Part (a) of the Exclusion

The exclusions set forth in the Protective Safeguards Endorsement provide that:

> We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:
>
> (a)     Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

      (b)    Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

As stated previously, the undisputed facts as set forth in the Report & Recommendation establish that the sprinkler system at Plant 2 had developed a leak, that Schwartz knew of that leak, and was trying, but was not yet able to, to repair the leak in the weeks leading up to the fire. Schwartz argues that part (a) does not apply because "the leak and the maintenance work to repair the leak ... were not a known suspension or impairment in the sprinkler system." Schwartz's Objections to the Report & Recommendation, at 6. It is undisputed that the leak was *known* to Schwartz, which admits, *e.g.*, that "[i]n the days before the fire on November 11, 2005, Pillow was actively engaged in maintenance work to repair an underground leak in the South loop of the sprinklers system." *Id.* at 2. The only question then raised by Schwartz is whether the leak, or Schwartz's response to leak, can be characterized as a "suspension or impairment in the sprinkler system."

A leak in the sprinkler system would appear to fit within the ordinary and accepted definition of the term, "any ... impairment," in part (a) of the exclusion. To "impair," as the root of "impairment," is defined as "to make worse, less, weaker, etc.; damage; reduce." *Webster's New World College Dictionary*, at 703. Furthermore, "impairment" is qualified by "any," which serves to expand and not restrict the possible class of "impairments" for which notification to Underwriters would be required. Yet Schwartz contends that "[t]he leak was insufficient to prevent water flow to the sprinkler heads or otherwise impede the operation of the sprinkler system," Schwartz's Objections to the Report & Recommendation, at 3, and the Magistrate Judge found that "[t]o be sure, there are factual issues as to just how much water was flowing out of the leak." Report &

Recommendation, at 12. The Court, however, is not required to decide whether the leak, without more, would be sufficient to trigger the notice requirement under part (a) of the exclusion.

The Magistrate Judge found that "there is no dispute that at the time of the fire this system was partially shut off and was not available to help suppress the fire." Report & Recommendation, at 12. Schwartz contests the terminology used by the Magistrate Judge (*i.e.* that it "shut off" part of the sprinkler system) but it admits the relevant underlying facts. It admits that in order to "safely repair this leak, Pillow first had to depressurize the South loop and isolate it from the remainder of the sprinkler system. Pillow attempted to do this by closing three control valves, but one of these valves referred to as the 'curb box' would not seal properly. ... When Pillow arrived on the scene on the night of the fire, *he immediately reopened the curb box and water flowed through the South loop.*" Schwartz's Objections to the Report & Recommendation, at 2 (emphasis added). Schwartz also admits that as a result of "exercising the curb box on a daily basis," the sprinkler system "was never less than fully charged for 48 hours," and that "[a]t the time of the fire, the curb box had been closed for 36 hours or less." *Id.* at 7.

Whether or not the leak, without more, would fall within the term "any ... impairment" requiring Schwartz to give notice to Underwriters is not at issue. "[T]here is no dispute that at the time of the fire this system was partially shut down and was not available to help suppress the fire." Report & Recommendation, at 12. However Schwartz seeks to characterize its actions, there is no issue as to material fact on this point. Schwartz knew of the leak, and knowingly took the aforementioned steps in an attempt to fix the leak. As a consequence of these steps, portions of the sprinkler system were shut off and were not available to help suppress the fire. The leak and the steps taken to repair the leak thus fit within the ordinary and accepted definition of "any suspension or impairment" of the sprinkler system. Therefore, notice to Underwriters was required, and it is

undisputed that Underwriters were not so notified. The exclusion in part (a) of the Protective Safeguards Endorsement applies and Underwriters are not held liable for the fire loss.

## 2. Part (b) of the Exclusion

Separately, Schwartz did not fulfill its obligation in part (b) of the Protective Safeguards Endorsement, as it "[f]ailed to maintain any protective safeguard listed in the Schedule above, and over which [Schwartz] had complete control, in complete working order."

The Magistrate Judge addressed part (b) of the Protective Safeguards Endorsement, and concluded that Schwartz did not fulfill its responsibilities under that provision, in the following discussion:

> Schwartz was warranted, indeed obligated, to try and fix the leak, but where it failed to meet its obligations under the insurance policy in this case was that at all times except when Pillow was exercising the curb box valve, the southern loop was shut down and not "in complete working order." Therefore, regardless of whether Schwartz was excused from its obligation to notify Underwriters, it plainly breached a separate obligation to keep the sprinkler system in "complete working order."

Report & Recommendation, at 15.

Schwartz has objected to this portion of the Report & Recommendation, arguing that the word "maintain" is recognized under Virginia law as susceptible to various meanings depending upon the context. The Protective Safeguards Endorsement, according to Schwartz, "precludes coverage for failing to do required maintenance, not for doing so. At the time of the fire, Schwartz was working to maintain the sprinkler system by trying to repair a leak. To deny coverage would penalize Schwartz for its maintenance efforts and frustrate the purpose of the Protective Safeguards Endorsement." Schwartz's Objections to the Report & Recommendation, at 11.

Particularly pertinent to this section of the exclusion, Schwartz has called the Court's attention to the recent decision of *Breton, LLC v. Graphic Arts Mut. Ins. Co.*, 2009 WL 3762302

(E.D. Va. Nov. 10, 2009), which interprets policy language in the Protective Safeguards Endorsement, as supporting its interpretation of the word "maintain." Schwartz cites the *Breton* court's statement that "there is a wide range of meanings of 'maintain,'" and notes its refusal "to impose implied duties on an insured through the vagaries of the word." *Breton*, 2009 WL 3762302, at *7. As a result, Schwartz argues that this decision reaffirms its position that Underwriters "cannot show, especially as a matter of law, that the Protective Safeguards Endorsement excludes coverage for Schwartz's fire loss." Schwartz's Notice of New Authority, at 2.

This opinion is certainly relevant to the instant case, as it concerns an insured that was denied coverage for allegedly failing to satisfy its obligations under the Protective Safeguards Endorsement with respect to the maintenance of a sprinkler system. However, Schwartz's argument as to the importance of the *Breton* opinion is necessarily limited to whether it has satisfied its obligations under part (b) of the Protective Safeguards Endorsement. In its inquiry into "whether either of the two loss exclusions" in the Endorsement applied, the court in *Breton* specifically declined to comment on the language of part (a), noting the fact that "Graphic Arts does not contest Breton's statement that Breton had no knowledge that the sprinkler system was suspended or impaired," and that "[a]ccordingly, Graphic Arts has not shown that Breton's loss falls within the first exclusion." *Breton*, 2009 WL 3762302, at *8. In contrast, under the present circumstances, part (a) of the Protective Safeguards Endorsement operates to exclude Schwartz from coverage, as it is undisputed that Schwartz had knowledge of "any suspension or impairment" in the sprinkler system, and failed to notify Underwriters of that fact. The only remaining question then, is whether Underwriters could additionally deny coverage to Schwartz under part (b) of the Protective Safeguards Endorsement.

The Court finds that the language in part (b) of the Protective Safeguards Endorsement – which provides that insurance coverage may be denied if Schwartz "[f]ailed to maintain any

protective safeguard listed in the Schedule above, and over which [Schwartz] had control, in complete working order" – is not ambiguous.

As stated previously, an undefined term in an insurance policy "must be given its ordinary and accepted meaning." *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 260 Va. 77, 86, 532 S.E.2d 325, 330 (2000). Furthermore, the "ordinary and accepted meaning" of an undefined term must be based upon the context in which it appears. *See e.g., CACI Intern., Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 158 (4th Cir. 2009) (writing that the court "can further interpret" an undefined term "by considering its meaning in the context of the policies as a whole") (citing *Res. Bankshares Corp.*, 407 F.3d at 636); *Atlas Underwriters, Ltd. v. Meredith-Burda, Inc.*, 231 Va. 255, 258, 343 S.E.2d 65, 67 (1986) (writing that even though certain terms are not defined in the policy, "we hold that in the context of this insurance contract these crucial words are clear and unambiguous"). Thus, it has been specifically recognized that "the word 'maintain' has several meanings, *each depending upon the context of the statement in which it was used.*" *Savage v. Commonwealth*, 186 Va. 1012, 1020, 45 S.E.2d 313, 317 (1947) (emphasis added).[5]

The word "maintain," has been defined to mean "to keep in an existing state (as of repair, efficiency, or validity)," or "to preserve from failure or decline." *Merriam-Webster's Collegiate Dictionary* 702 (10th ed. 1994). These and other various definitions of the word "maintain" were collected by the court in the *Breton* opinion. *See* 2009 WL 3762302, at *7. However, the opinion in *Breton* is distinguishable from the present circumstances, as the court was specifically interpreting different language of the Protective Safeguards Endorsement, which provides that "[a]s a condition

---

[5] A broader reading of the opinion in *Savage v. Commonwealth*, which Schwartz cites in support of its contention that the word "maintain" is ambiguous, actually serves to undermine its argument. While the Virginia court recognized that "the word 'maintain' has several meanings," the court concluded that its definition was "manifest" as it was "employed in [the specific statute], and considered in connection with the word 'exclusively' and the whole context." *Id.* at 1020. Similarly, while the term "maintain" may have different meanings in various dictionaries, the Court is to determine whether its meaning is ambiguous in the context of part (b) of the Protective Safeguards Endorsement, and in

of this insurance, you [insured] are required to maintain the protective devices or services listed in the Schedule above." *See id.* at *7 (noting that "[t]his Court must therefore determine whether the word 'maintain' in paragraph 1a of the Endorsement is ambiguous"). This language is found on the page prior to the Protective Safeguard Endorsement language at issue in the present case. *See* Exhibit B to Complaint, docket no. 1, at 26. The difference between the language on this prior page that was interpreted in the *Breton* opinion, and that in part (b) of the exclusion is significant, and was recognized as such in that opinion. The court in *Breton* addressed the significant difference in this language as follows:

> Following the rule of *contra proferentem*, the Court finds that the narrower definition of "maintain" is both a reasonable one and one that increases rather than denies or decreases coverage. In reaching this conclusion, the Court finds significant that the word "maintain" appears again in paragraph 2b of the Endorsement with the qualifying phrase "in complete working order." Specifically, paragraph 2b excludes coverage where the insured "[f]ailed to maintain [the automatic sprinkler system] ... in complete working order." *When considering both usages, the Court must conclude that the word "maintain" in paragraph 1a must have a meaning more limited than the phrase "maintain in complete working order."*

*Breton*, 2009 WL 3762302, at *7 (emphasis added). The Court is not called upon, under the present facts, to address the language of paragraph 1a of the Endorsement that was at issue in *Breton*, nor that court's determination that "maintain," without more, was ambiguous. The operative language in the Policy at issue in part (b) of the exclusion – which required Schwartz to "maintain ... in complete working order" its sprinkler system – is not only distinguishable, but was recognized as such by the court in *Breton*. The Court thus finds that the word "maintain," is not ambiguous in the context of

---

the context of its modifier, "failed to maintain [the sprinkler system] ... *in complete working order.*" (Emphasis added).

part (b) of the Protective Safeguards Endorsement. That provision requires that the insured "maintain," as in to "keep" or "preserve" the sprinkler system in "complete working order."[6]

It is undisputed that "at all times except when Pillow was exercising the curb box valve, the southern loop was shut down," Report & Recommendation, at 15. Schwartz has admitted as much. It has stated, *inter alia*, that as a result of "exercising the curb box on a daily basis," the sprinkler system "was never less than fully charged for 48 hours," and that "[a]t the time of the fire, the curb box had been closed for 36 hours or less." Schwartz's Objections to the Report & Recommendation, at 7. Therefore, because the curb box valve was left in a closed position (and the southern loop of the sprinkler system thus shut down) except for those times when Pillow opened it, there is no disputed issue of material fact that Schwartz has also breached a separate obligation to "maintain" the sprinkler system in "complete working order."

The Court hereby adopts the recommendation of the Magistrate Judge for these reasons and the other reasons articulated in the Report & Recommendation, and grants Underwriters' Motion for Summary Judgment.

### C. Schwartz's Motion for Partial Summary Judgment as to Damages & Underwriters' Motion for Judgment on the Pleadings

Having thus found that Underwriters' Motion for Summary Judgment should be granted, the Court hereby denies Schwartz's Motion for Partial Summary Judgment as to Damages, and Underwriters' Motion for Judgment on the Pleadings, as moot.

It is so ORDERED.

---

[6] In defining "maintain," the court in *Breton* stated that the definition "to keep in an existing state; preserve or retain," was a "restrictive and narrow meaning," and that the definition "to keep in a condition of good repair or efficiency" was "the broader meaning." *Breton*, 2009 WL 3762302, at *7. The nuanced definitions of "maintain" were particularly important in the context of that opinion that interpreted paragraph 1a of the Protective Safeguards Endorsement, which included the term "maintain" without further clarification. However, the modifier in part (b) of the exclusion, that Schwartz was required to "maintain [the sprinkler system] ... *in complete working order*" serves to more

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion, and accompanying Order to all counsel of record.

Entered this 29ᵗʰ day of December, 2009.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

precisely define the term "maintain" in this context.